IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

March 24, 2015 Session

**STATE OF TENNESSEE v. FREDERICK KEITH**

**Direct Appeal from the Criminal Court for Knox County**
**No. 93721     Steven W. Sword, Judge**

---

**No. E2014-00448-CCA-R3-CD – Filed July 16, 2015**

---

The appellant, Frederick Keith, was convicted in the Knox County Criminal Court of first degree felony murder, and the trial court sentenced him to life. On appeal, the appellant contends that the evidence is insufficient to support the conviction, that the trial court erred by failing to grant his motion to sever his case from that of his co-defendant, and that the State committed prosecutorial misconduct during closing arguments by vouching for the credibility of State witnesses. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT L. HOLLOWAY, JR., JJ., joined.

Robert R. Kurtz, Knoxville, Tennessee, for the Appellant, Frederick Keith.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Charme P. Allen, District Attorney General; and Leslie R. Nassios, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In February 2010, the Knox County Grand Jury indicted Michael Lambdin, Anthony White, and the appellant for first degree felony murder committed during their

attempt to rob Vincent Presutto, who was shot and killed. On the morning of the first day of trial, the State orally moved to sever White's trial from that of his co-defendants. The trial court granted the motion, and the appellant and Lambdin proceeded to trial.

Barbara Eaton testified that on December 17, 2009, she was living in the Woodgate apartment complex on Cedar Lane in Knoxville and that her apartment was "[r]ight behind" apartment 109. About 11:15 p.m., Eaton returned home from work and pulled into the parking lot. She saw a small, dark-colored pickup truck with "Mazda" on the tailgate. The truck was in Eaton's parking space, and she noticed that the truck's headlights were turned off but that its parking lights were turned on. She said that the truck "started creeping a little bit" so that it eventually moved out of her space and into a space across from where she usually parked. Eaton could not see how many people were inside the truck.

Eaton testified that as she was backing into her parking space, she hit something. She said that she stopped and that a young, white male "come running around and stopped right at my window for a second." Eaton looked at the male, he looked at her, and he ran to the truck and got in. Eaton described the male as short, blonde, blue-eyed, and wearing a camouflage jacket. She turned off her car engine and heard someone yelling for help. Eaton looked to her left and saw a second male "come running out through the breezeway." The pickup truck pulled up to the sidewalk, and the second male "jumped" into the truck. The truck pulled onto Cedar Lane with its headlights still turned off.

Eaton testified that as she was walking to her apartment, she received a telephone call from a friend who worked at 911. The friend told her, "'Go in the house. There was just a shooting.'" Eaton walked to the victim's apartment to see if she could help and saw the victim lying on the ground. She said that his apartment door was open and that she saw "quite a bit of blood." In the early morning hours of December 18, an investigator showed Eaton a photograph array, and she identified the first male's photograph. She said that about one and one-half minutes elapsed between her seeing the first male and the second male.

On cross-examination by the appellant, Eaton acknowledged that she identified Lambdin as the first male. She said that the second male had dark hair and was wearing a camouflage jacket but that she could not identify him. On cross-examination by Lambdin, Eaton testified that the second male "[ran] as fast as he could to the truck" but that the first male "ran slower to the truck." Eaton never heard a gunshot.

Alan Bull of Knox County 911 testified that on December 17, 2009, the 911 center received calls about a shooting. The State played the audio-recorded calls for the jury.

During the first call, which was recorded at 11:19 p.m., a woman reported that someone in her apartment complex had been shot. She said she heard one gunshot, went outside, and heard a man screaming, "Help me, help me!" The caller, who was inside her apartment, said that the victim was outside and that "I don't hear him anymore." During the second call, a woman reported that she heard a man calling for help and that he sounded like he was in pain. During the third call, which was recorded at 11:20 p.m., the victim telephoned 911 but hung up or was disconnected. The dispatcher called the victim's cellular telephone, and the victim answered. The victim yelled, "Help me!" and "701 Woodgate!" The victim said he had been shot and continued to yell for help. The victim said "help" one last time before the call ended. In the fourth call, which was recorded at 11:21 p.m., a man said that he heard a gunshot and that someone was outside his apartment, screaming for help. He said that he heard "a big bang" and that he did not know if the victim "fell or what." During the fifth call, a man reported that a male had been shot, that the victim was lying on the sidewalk, and that the victim had "lost a ton of blood."

Shane Hunter Williams, who made the fourth call to 911, testified that on December 17, 2009, he was watching television in his living room when he heard "a loud bang" and "a man start yelling for help." Williams went upstairs, looked out his bedroom window, and saw the victim lying on his back near a concrete retaining wall that was three to four feet tall. Williams said that prior to the shooting, he heard voices and "some yelling or something like that. I wasn't sure how many people or what was going on, but it got my attention."

On cross-examination by the appellant, Williams testified that he heard "[j]ust some vague voices" prior to the shooting and that he did not hear a struggle or anyone running. He said he had never seen the victim before December 17.

Jack Dixon testified that on December 17, 2009, he lived in the Woodgate apartment complex and went to bed about 11:30 p.m. Dixon said that he heard a gunshot, that he heard "someone holler for help," and that he immediately called 911. He said that he had worked for the sheriff's department for twenty-seven years, that he had been a hunter for fifty-five years, and that the gunshot was fired from "a large-caliber weapon, either a short barrel rifle or a large magnum type pistol." Dixon looked out his kitchen window but did not see anyone. He got dressed, went outside, and saw the victim lying in a fetal position. The victim had lost a lot of blood and appeared to be deceased. The door to the victim's apartment was open, and Dixon saw "a large amount of blood in the front door into the kitchen area." A light inside the victim's apartment was on, and Dixon saw a four-inch stainless steel or nickel-plated revolver in the doorway. He said several police officers arrived and protected the crime scene for detectives.

- 3 -

On cross-examination by the appellant, Dixon testified that he did not know the victim, that he did not hear any fighting before the shooting, and that he did not hear footsteps leave the scene. He said that more blood was outside where the victim was lying than inside the apartment but that "there was a trail of blood there and down the steps . . . on the porch."

Jason Huiting testified that he and the victim were friends for three or four years. In December 2009, the victim lived in the Woodgate apartment complex and was a bartender and server at Wild Wings Café. The victim had a young son and was married but was separated from his wife. Huiting said that the victim was addicted to opiates, that the victim had a prescription for pain pills, and that the victim sometimes sold the pills. On the night of December 17, Huiting went to the victim's apartment and stayed ten to fifteen minutes. The victim did not make any telephone calls during that time, and Huiting did not know if the victim was expecting anyone else at the apartment after he left. About 3:00 a.m. on December 18, Huiting learned about the shooting and contacted the Knoxville police.

On cross-examination by the appellant, Huiting testified that the victim had been using pain pills for as long as he had known the victim and that the victim had filled a prescription on December 17. On cross-examination by Lambdin, Huiting acknowledged that the victim was a "small time" drug dealer and that the victim usually kept his apartment door locked.

Gerald Smith testified that in 2009, he processed crimes scenes for the Knoxville Police Department (KPD) Forensic Unit and arrived at the scene at 11:32 p.m. on December 17. The victim was receiving medical treatment just outside apartment 109. After paramedics removed the victim, Smith photographed apartment 109 and the area outside the apartment. Smith noticed "an obvious bullet hole in the door near the opening side." The hole went through the door.

Smith testified that he collected the victim's cellular telephone, which had been on the ground near the victim; the victim's eyeglasses, which were at the base of a short set of steps coming down from the victim's apartment; a camouflage baseball cap that was just inside the doorway of the apartment; a red, white, and blue toboggan that was outside on a ledge near the victim; and a cigarette on the ground below the toboggan. The cigarette was still burning. Smith saw a Smith and Wesson forty-four-caliber, six-shot revolver inside the apartment. The gun was on the floor between a tiled foyer area and the living room carpet and contained five unfired cartridges and one spent cartridge. The gun was three feet inside the door. The camouflage cap also was in the tiled foyer area but was near the entrance to the kitchen. Blood was in the kitchen, demonstrating that the victim had walked into the kitchen after he was shot. Blood also was on the steps outside

the apartment door and led to "the main blood pool where the victim was found." Smith opined that the victim had been shot inside the doorway of the apartment and that the victim then moved around, ending up outside the apartment.

Smith testified that officers searched the apartment and found two empty prescription bottles and a drugstore receipt. One of the bottles showed that hydrocodone had been prescribed to the victim. The drugstore receipt showed that the victim had filled a prescription for 120 oxycodone pills that day. However, officers did not find any drugs in the apartment. The bullet hole in the apartment door was fifty-two inches from the base of the door. A trajectory rod inserted into the hole showed that the bullet was fired at an angle and slightly downward and that the door was open when the gun was fired. Smith estimated that the door was open twelve to sixteen inches at the time of the shooting. The victim was shot in the shoulder; therefore, his body had to be lower than fifty-two inches when he was shot.

On cross-examination by the appellant, Smith testified that blood was underneath the camouflage cap in the foyer and that he believed the hat fell onto the blood. The cap was twenty-eight to thirty inches from the front door and two feet from the gun. Smith said that he thought the victim was in the center of the foyer at the time of the shooting and that the victim was closer to where the gun was found than where the cap was found. On cross-examination by Lambdin, Smith testified that he thought the victim was crouched down, trying to keep the shooter out of the apartment, when the victim was shot.

Investigator Timothy Schade of the KPD Forensic Unit testified that he assisted Gerald Smith with processing the crime scene and that he photographed the gun. Blood was on the weapon. Investigator Schade, a certified latent fingerprint examiner, collected fingerprints from the front door, and the prints appeared to be from the three middle fingers of someone's hand. Investigator Schade compared the prints to known fingerprints from the victim, the appellant, Lambdin, and Jason Huiting, but the prints on the door did not match anyone. On cross-examination by the appellant, Investigator Schade testified that he was unable to obtain fingerprints from the gun or the cartridges inside the gun.

Patricia M. Resig of the KPD testified as an expert in firearms identification that she examined the revolver found in the victim's apartment, one fired cartridge case from the gun, five "live" rounds from the gun, and a bullet recovered from the victim. She concluded that the fired cartridge case was fired in the gun and that the bullet from the victim passed through the barrel of the gun. Resig said that the gun was an older-model Smith and Wesson but that it was "in pretty good condition." She described it as a "powerful weapon," firing large-caliber bullets.

On cross-examination by the appellant, Resig testified that she tested the gun and that ten to eleven pounds of pressure were needed to fire it. If the hammer was already cocked, though, only four to five pounds of pressure were needed to fire the weapon.

Natalie Freeman testified that in December 2009, she was dating Anthony White and lived on East Oldham Avenue in Knoxville. Freeman had known the appellant for a long time and thought of him as her brother. She also knew Lambdin but did not know him well. On the night of December 17, White and the appellant brought Lambdin to Freeman's house "because we were all going to be drinking." The three men arrived about 9:30 or 10:00 p.m., and everyone consumed rum. At some point, Freeman was in the kitchen alone and heard the appellant and Lambdin talking on the back porch. The appellant and Lambdin were talking about Lambdin arranging to buy pills from the victim. Lambdin wanted the appellant and White to help him because Lambdin wanted to rob the victim. White was to drive the appellant and Lambdin to the victim's apartment, and the appellant was to be Lambdin's "muscle."

Freeman testified that prior to the three men leaving for the victim's apartment, Lambdin talked to the victim on the telephone, and Freeman saw Lambdin pull a gun out of his pocket. She described the weapon as "a handgun, big, silver, had a six-shooter type spin on it." The men left Freeman's house about 11:00 p.m. in White's small Mazda pickup truck. Lambdin was wearing blue jeans, a t-shirt, a camouflage jacket, and a camouflage baseball cap, and the appellant was wearing blue jeans, a t-shirt, a colorful hoodie, and a red and blue toboggan.

Freemen testified that the men were gone for twenty-five to thirty minutes. When they returned, the appellant and Lambdin were not wearing their hats, and Lambdin did not have his gun. Freeman said that the appellant was "out of sorts" and very pale and that Lambdin was crying and yelling. Lambdin was upset that his gun was gone because it had been "passed down to him." Freeman said that she parked White's truck down the street from her home because she did not want the police to come to her house and that she wanted him to "get rid" of the truck. The next morning, White drove the truck somewhere. At some point, Freeman heard a description of White's truck on the news and that the police were looking for two white males. On December 27, 2009, Freeman talked with Investigator Charlie Lee and gave a statement but was "[n]ot completely" truthful with the officer. She said that she knew Lambdin, White, and the appellant were going to the victim's house to rob the victim of oxycodone on December 17 and that she did not alert the police or the victim.

On cross-examination by Lambdin, Freeman acknowledged that she did not want to testify against the defendants. She said she overheard the appellant's and Lambdin's

conversation about planning the robbery while she was in the kitchen and they were on the porch. She said that the appellant's "idea was that they could just go in at the same time and just rob him flat out, just in and out." However, Lambdin "was concerned that [the victim] would know he had been set up." When the men returned to Freeman's home after the shooting, the appellant told Freeman what had happened. He told her that Lambdin went inside the victim's apartment, came outside, and was running. The gun was on the ground. The appellant picked up the gun, and he and the victim fought over it. During the struggle, the gun "went off," and the appellant ran away.

Freeman acknowledged that after the men returned to her house from the victim's apartment, Lambdin was crying and vomiting. She also acknowledged that she believed the gun fired accidentally. The appellant did not tell her that the victim was shot through the door or that he hit the victim with the weapon. She said she helped the appellant leave Tennessee after the shooting by giving him one hundred dollars. However, the appellant returned to Tennessee and was with Freeman when she talked with Investigator Lee on December 27. Freeman acknowledged that, according to her statement to the investigator, she and White were in her bedroom when she heard the appellant and Lambdin talking on the porch. She explained that she heard them talking from her bedroom, that she went into the kitchen alone, and that she heard them conversing on the back porch. Freeman acknowledged telling Investigator Lee that Lambdin said after the shooting, "'I didn't think that was going to happen. . . . I didn't mean for all that to happen.'" She also acknowledged that she did not tell Investigator Lee that Lambdin was upset about losing his gun. She told the officer that the appellant and Lambdin did not take anything from the victim.

On cross-examination by the appellant, Freeman acknowledged that Lambdin was proud of his gun. She denied insisting that White drive the appellant and Lambdin to the victim's apartment. She acknowledged that it was Lambdin's plan to telephone the victim, that Lambdin had "dealt" with the victim previously, and that Lambdin was mad at the victim because the victim kept increasing the price of the pills. She also acknowledged that Lambdin did not want to lose the victim as his "dealer" and, therefore, that Lambdin "set this up to look like he was . . . being robbed as well." While the men were gone to rob the victim, Freeman continued to drink rum. When they returned to her home, she was intoxicated. Freeman said she was not completely honest with Investigator Lee because she was trying to protect White and the appellant but that she thought she "was pretty up front about everything" Investigator Lee asked her.

Co-defendant Anthony White testified that he had known the appellant three or four years and Lambdin since middle school. On the night of December 17, 2009, White and the appellant were at Natalie Freeman's house. White's telephone rang, and the appellant answered it. The call was from Lambdin. After the appellant spoke with

Lambdin, the appellant told White that Lambdin wanted to come to Freeman's house to "hang out." White and the appellant drove White's pickup truck to the IHOP on Merchants Road, picked up Lambdin, and drove back to Freeman's house. White said that during the drive, the appellant and Lambdin talked about robbing "this guy that had Roxies that just came back from Florida." Lambdin said he had his "papaw's" gun, said he knew the victim, and referred to the victim as a "pushover." White did not know the victim or where the victim lived.

White testified that after being at Freeman's house for twenty or thirty minutes, he, the appellant, and Lambdin decided to go to the victim's apartment. He said that as they were getting ready to leave, the appellant "came up to me and showed me the gun and said we got to ride out here to do that, so we all loaded up in the truck and took off." White knew they were going to rob the victim of pills, and Lambdin directed White to the victim's apartment. When they arrived in the Woodgate parking lot, they discussed that Lambdin was going to knock on the victim's door and that the appellant was going to run into the apartment, point the gun at the victim, and rob the victim. Lambdin was supposed to return to the truck during the robbery. White said that Lambdin and the appellant got out of the truck and went to the victim's apartment. Lambdin was wearing a Carhartt jacket, and the appellant was wearing a "Mario beanie." White waited in the truck but had to back out of the parking space it was in because another vehicle wanted to park there. While the other vehicle was moving into the space, it almost hit Lambdin. White said Lambdin got into the truck and "seemed skittish, scared." Two or three minutes later, the appellant ran to the truck and told White, "Go fat man. Go." Neither man was wearing a hat when he returned to the truck.

White testified that the appellant was angry and that the appellant started punching the dashboard. The appellant was "mainly" angry at Lambdin because Lambdin had said that the appellant was a "pushover" and that the robbery "would be easy." The appellant said that the victim fought back and that the gun "went off." When the three men returned to Freeman's house, Lambdin kept asking the appellant if the appellant was going to kill him. White learned that they had left the gun at the apartment complex, and Lambdin said that "his grandmother was going to kill him." The appellant was upset that he had lost his beanie and did not know if he had shot the victim. The appellant and Lambdin told White that "they didn't get nothing" from the victim. Freeman decided that she and White would park White's truck at St. Mary's hospital.

White testified that he talked with Investigator Lee twice after the shooting. The first time, he pretended not to know anything about the incident. He said he was not truthful with the officer because he was scared he was going to get into trouble. He acknowledged that he was charged as a principal offender in this case and that he and the State had an agreement regarding his testimony and cooperation.

On cross-examination by the appellant, White acknowledged that in order to keep his "deal" with the State, he had to testify truthfully. He said his agreement with the State was a guilty plea in exchange for a thirteen-year sentence to be served as one year in jail and twelve years "on paper." However, he had not yet pled guilty and did not remember to what offense he was going to plead guilty. White spoke with Investigator Lee on December 29, 2009, and February 6, 2010, and lied to the officer both times. He was arrested and charged with first degree murder on February 6, 2010; had his bond originally set at $150,000; and spent almost one month in jail. He acknowledged that his attorney worked out a "deal" with the State so that he was released on a $1,000 bond, which was an unusual amount for a felony murder charge.

White acknowledged that he was intoxicated on the night of December 17, 2009, and that Lambdin "came up with this plan." At some point that night, Lambdin showed the gun to White. Lambdin told White that the gun had belonged to his grandfather and that it was a family heirloom. The appellant also showed the gun to White. White acknowledged that Freeman insisted that he drive to the victim's apartment and said that she wanted him to drive because they were using his truck to commit the robbery. He said that he did not think Freeman helped plan the robbery but that "[s]he could have." White stated that he had had mental problems, which included hearing voices and having hallucinations, "[a]s far back as I remember" and that he used to meet with a mental health specialist. He acknowledged that he consumed alcohol and smoked marijuana on December 17, 2009, but said that he had been "clean" since he got out of jail.

On cross-examination by Lambdin, White acknowledged that he was twenty-one years old when he spoke with Investigator Lee and that some of what he told the officer was true. For example, White told Investigator Lee that he and the appellant were close friends; that the appellant claimed he and the victim struggled over the gun; and that the appellant claimed the gun "went off." He acknowledged that he did not want to testify against the appellant. He also acknowledged that the appellant was angry after the shooting because the victim had fought back and because the appellant had lost his toboggan. White said that he was two years older than Lambdin and that Lambdin began buying marijuana from him in 2008. Lambdin was addicted to pain pills and met the appellant and Freeman through White. White said that after he and the appellant picked up Lambdin at the IHOP on December 17, Lambdin explained the plan to rob the victim. The appellant decided that Lambdin should knock on the victim's door, and Lambdin said he would "get out of the way" so that the appellant could rob the victim. White did not tell Freeman about the plan. He said that before he, the appellant, and Lambdin left Freeman's house to rob the victim, the appellant had Lambdin's gun. White said that despite being intoxicated on the night of the shooting, he could not forget what happened because "[i]t haunts me."

Kim Lusignan, a special agent forensic scientist with the Tennessee Bureau of Investigation (TBI), testified as an expert in DNA analysis that she analyzed DNA found on the toboggan, the cigarette, and fingernail scrapings from the victim and compared the results to known standards from the appellant, Lambdin, and the victim. Agent Lusignan found two small areas of blood on the toboggan, and the blood was that of the victim. She found skin cells inside the toboggan. The appellant was a major contributor of the cells, and an unknown male was a minor contributor. DNA on the cigarette was that of an unknown male, and DNA from the victim's fingernail scrapings was that of the victim. On cross-examination by the appellant, Agent Lusignan testified that she did not receive a camouflage cap for testing.

Investigator Charles Lee of the KPD testified that he was in charge of investigating this case, that he went to the Woodgate apartments on the night of December 17, 2009, and that paramedics had already transported the victim to the hospital. He observed the crime scene inside and outside the victim's apartment. He saw empty prescription bottles in the apartment and suspected that the shooting could have been related to prescription drugs. He spoke with Barbara Eaton and determined that three suspects probably were involved. Eaton also gave a good description of the getaway vehicle. Investigator Lee learned that the victim had died upon arrival at the hospital or shortly thereafter and went to the home of the victim's next of kin, Jennifer Presutto, to tell her that the victim was deceased. Ms. Presutto was very distraught but gave Investigator Lee the names of the victim's friends and acquaintances. One of those names was "Michael Lambdin," and Investigator Lee found a contact phone number for "'Lambdin'" in the victim's cellular telephone. Investigator Lee also knew from the phone that the victim had contact with Lambdin within thirty minutes of the victim's death. He prepared a photograph array containing Lambdin's photograph and showed it to Eaton. Eaton identified Lambdin as the first male she saw on the night of December 17.

Investigator Lee testified that he also determined that he needed to speak with Anthony White and Natalie Freeman. Freeman corroborated some of the evidence found at the crime scene, such as the toboggan, and corroborated the getaway vehicle. Investigator Lee obtained the records for the victim's and Lambdin's cellular telephones, and the records revealed contact between the two phones throughout the afternoon and evening hours of December 17, 2009. The State introduced the records into evidence.

On cross-examination by Lambdin, Investigator Lee testified that a prescription receipt found in the victim's apartment showed that an oxycodone prescription had been filled on December 17 at a local pharmacy. Investigator Lee searched the victim's apartment for the prescription bottle but never found it. On cross-examination by the

appellant, Investigator Lee testified that he did not perform gunshot residue tests on anyone or submit the camouflage cap found in the victim's apartment to the TBI for testing.

Steven Cogswell, the Deputy Chief Medical Examiner for Knox and Anderson Counties, testified as an expert in anatomic and forensic pathology that he performed the victim's autopsy. The victim's primary injury was a gunshot wound of intermediate range, meaning that the muzzle of the gun was a couple of feet from the victim when it was fired. The bullet entered the victim's right collar bone area, broke his collar bone, and lacerated the blood vessels directly beneath his collar bone. The bullet moved into the victim's chest wall and stopped in the soft tissue of his back. It did not strike his heart or lungs. The victim bled to death from the injury to his subclavian artery and vein.

Dr. Cogswell testified that the victim also had two scalp wounds that were consistent with his having been struck by the revolver. One of the wounds was a "Y-shaped abraded laceration," seven-eighths of an inch long, and just to the left of the top of the victim's head. The second wound was "a very slightly depressed skull fracture" above the victim's hairline. The victim also had two abrasions between the thumb and forefinger of his right hand. During the autopsy, Dr. Cogswell examined the revolver recovered from the crime scene. He concluded that the ejector rod on the gun probably caused the Y-shaped laceration and that the frame of the gun caused the injury near the victim's hairline. He said the two abrasions on the victim's right hand matched the top of the revolver's frame and occurred when the victim grabbed the barrel of the gun "right around the frame."

Dr. Cogswell testified that he examined photographs of the crime scene and concluded that the muzzle of the gun was probably within one foot of the door when it was fired. No soot was on the victim, but gunpowder stippling was on his chin and neck. Dr. Cogswell said that an area under the victim's chin was free of stippling, meaning that something had blocked the gunpowder, and that the victim's injuries were consistent with the bullet's having passed through the door and striking the victim. He stated that he inserted a trajectory rod into the gunshot wound and that the rod showed the bullet traveled downward and slightly left to right. The victim was sixty-six inches tall and was probably "down a little bit" when he was shot. However, the bullet hole in the door was too high for the victim to have been "all the way in a ball on the floor."

Dr. Cogswell testified that the victim would have been able to walk, run, and speak after he was shot and that his head injuries could have occurred after the shooting. He said that because the victim's hand was around the gun at some point and because the gun was found inside the apartment, "it makes sense that he's actually taking the gun away from the person who shot and killed him." The victim was still alive when he

arrived at the hospital but died during surgery. Toxicology tests showed that his blood contained a therapeutic level of methadone but a "relatively high," even lethal, level of oxycodone. The victim's urine showed that he recently had used marijuana; cocaine; oxycodone; methadone; and ditiazem, a cardiac drug. Dr. Cogswell said that if the gun was in proper working order, the trigger had to be pulled in order for it to fire.

On cross-examination by Lambdin, Dr. Cogswell testified that the stippling on the victim resulted from gunpowder that traveled around the door. He acknowledged that a likely sequence of events was that someone shot the victim, the victim received the head injuries, the victim grabbed the gun, and the gun ended up on the floor.

On redirect examination, Dr. Cogswell testified that the camouflage cap found in the foyer was on top of blood. Therefore, the hat fell onto the already-bloodied floor, and then blood continued to fall on top of the hat. At the close of Dr. Cogswell's testimony, the State rested its case.

Co-defendant Michael Lambdin testified that he was twenty-two years old at the time of trial and nineteen at the time of the victim's death. In 2008, Lambdin graduated from Sevier County High School and began attending Tennessee Technical Center. The victim was also a student at Tennessee Tech, and they became friends. At that time, Lambdin was consuming two to three pain pills per day. The victim also was consuming pills, and Lambdin bought pills from him. The victim obtained the pills locally from prescriptions, and he would use some and sell some. The victim was nice to Lambdin, and Lambdin would go to the victim's apartment. Lambdin said that he saw the victim with the victim's young son and that the victim was "a really good dad."

Lambdin testified that he knew of Anthony White in middle school but that White was two or three grades ahead of him. In December 2009, Lambdin and White, whom Lambdin knew as "Fat Man," had been friends for about one year. Lambdin would buy marijuana from White and met Natalie Freeman and the appellant through White. White and the appellant were best friends. Lambdin said that on December 17, he spoke with the victim on the telephone. The victim told Lambdin that he had just filled a prescription and that he had plenty of pills. The victim asked if Lambdin wanted pills or knew of anyone who wanted them. Lambdin met the victim at a grocery store on Merchants Road and bought one pill from him.

Lambdin testified that later that day, he spoke with the appellant on the telephone. Lambdin told the appellant about the victim's having pills, and the appellant wanted to know the price of the pills. Lambdin told the appellant that the pills were twenty dollars each and that the victim would not take any less than that amount. The appellant asked Lambdin if the appellant could "take" the victim, meaning rob him, but Lambdin told the

appellant that he did not want the appellant to rob the victim. The appellant told Lambdin that no one would get hurt and that he would make the robbery look like Lambdin was not involved. The appellant said he would "just scare" the victim and take the victim's pills. The appellant asked if Lambdin had a gun, and Lambdin said yes.

Lambdin testified that later that night, he met the appellant and White at the Red Lobster on Merchants Road. The appellant and White were in White's "little brown Mazda truck," and Lambdin could smell alcohol on their breath. However, the appellant and White did not act intoxicated. The appellant told Lambdin to give him the gun, and Lambdin did so. The appellant never returned the gun to Lambdin. Lambdin said that the gun had been "passed down" to him through his family and that he usually kept it in a drawer at his grandmother's house. The weapon was always loaded, and he had never fired it.

Lambdin testified that the three of them went to Freeman's house. Lambdin saw a bottle of rum on a table in the living room, but he did not consume any alcohol. At some point, Lambdin told the appellant that the victim was going to know that Lambdin was involved in the robbery. The appellant explained the plan to rob the victim as follows: Lambdin was to knock on the victim's door while the appellant hid nearby. When the victim opened the door, the appellant was to run up to the door, pull Lambdin out of the way, scare the victim, and take the victim's pills. Lambdin was supposed to run away.

Lambdin testified that Freeman and White were present while the appellant was describing the plan. The appellant, Lambdin, and White left in White's truck, and White was driving. When they arrived at the Woodgate apartments, Lambdin and the appellant got out. Lambdin was wearing his camouflage baseball cap, and the appellant was wearing his red, white, and blue toboggan. Lambdin knocked on the victim's door, which the victim always kept locked. Lambdin had told the victim that he was coming to buy pills, so the victim was expecting him. The victim opened the door, but the appellant did not come running up to the door like he was supposed to. Lambdin went into the victim's apartment, and the victim shut the door. Lambdin told the victim that he had left his wallet in the truck and needed to go back to the truck to get it. The victim offered to let Lambdin pay for the pills "next time," which made Lambdin feel "[p]retty horrible," but Lambdin insisted on returning to the truck for his wallet.

Lambdin testified that he decided he "just couldn't do it," that he walked out of the victim's apartment, and that the victim shut the door behind him. The appellant was hiding under the steps. As Lambdin passed the appellant, he waved for the appellant to "come on." The appellant went to Lambdin and asked "what the [f***] was going on." Lambdin told the appellant that he "couldn't do it anymore" and told him, "Let's just -- let's just go." Lambdin said the appellant "got pretty mad," called him "a [f***ing]

[p***y],” and snatched the camouflage cap off his head. The appellant told Lambdin that “he’d just do it his [f***ing] self, to get back to the truck.” Lambdin said he did not try to stop the appellant because the appellant was mad and had the gun.

Lambdin testified that he started walking back to the truck. He heard a gunshot and began running to the truck. He said that he did not know what was going on and that he did not want anyone to get hurt. He acknowledged seeing Barbara Eaton and said he got into White’s pickup. White “pulled up just a little bit, and then [the appellant] come running and jumped in the truck.” The appellant told White, “‘Go, Fat Man, go. I shot him.’” Lambdin said the appellant was “pretty mad” and was “punching stuff and telling me to shut up crying.” Lambdin said he asked the appellant not to kill him.

Lambdin testified that they returned to Freeman’s house, that Freeman and the appellant went into the kitchen, and that the appellant told her what had happened. White and Freeman hid White’s truck, and Lambdin later saw on the news that the victim was dead. Lambdin said that while he was at Freeman’s house after the shooting, he cried and vomited because he had not wanted anyone to get hurt. When Lambdin later spoke with Investigator Lee, he did not tell the officer the truth. He said he thought about December 17, 2009, every night, that he “wished it wouldn’t have happened,” and that he “[wished he] could go and take it back and change it.”

On cross-examination by the State, Lambdin acknowledged that much of White’s and Freeman’s testimony was true. However, Lambdin never showed the gun to them. He acknowledged that he and the appellant discussed whether the victim would be easy to rob and that he led White and the appellant to the victim’s apartment, knowing that a robbery was going to occur. He also acknowledged that his gun was used to beat and shoot the victim and that he lied to Investigator Lee when he spoke with the officer on December 19, 2009. At first, Lambdin told Investigator Lee that he, the appellant, and White went directly to the victim’s apartment after they left the Red Lobster. However, he then told Investigator Lee that he remembered going to a house prior to the robbery. Lambdin told Investigator Lee that he was just trying to help some people buy some pills, that he knocked on the door to the victim’s apartment, that someone knocked him down the steps, and that he saw two people fighting. Lambdin told the officer that he ran to White’s truck and realized that the person who had knocked him down was one of the co-defendants. He acknowledged telling Investigator Lee that he did not know anything about the gun. Lambdin testified that the appellant had told him over the telephone to bring the gun and that he did so. He said that the appellant had led him to believe that no one would get hurt and that the appellant had “talked [him] into it.”

On cross-examination by the appellant, Lambdin acknowledged that he never told Investigator Lee the truth about what happened on the night of the shooting and that he

also lied to his mother and grandmother. Lambdin spoke with the victim for the first time on December 17 at 1:50 p.m., and they continued to communicate throughout the day. He said that he, the appellant, and White first began talking about the plan to rob the victim while they were driving from the Red Lobster to Freeman's house but that they mostly talked about the plan when they got to Freeman's home. He said that White and Freeman were lying when they said they saw him with the gun and that he did not know he was going to lose the gun when he gave it to the appellant. Lambdin denied coming up with the plan to rob the victim or being angry with the victim. He acknowledged that although he changed his mind about the robbery, he did not warn the victim or call help for the victim. He stated, "I thought I'd be able to call it off." He denied that he was upset about losing his gun when he got back into the truck or at Freeman's house. He also denied saying, "'My grandmother's going to kill me.'"

At the close of the proof, the jury convicted the appellant and Lambdin as charged of first degree felony murder. The trial court released the jury and sentenced the defendants to life.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant claims that the evidence is insufficient to support the conviction. He contends that although there is no doubt that he accompanied Lambdin to the victim's apartment or that the victim was shot with Lambdin's gun, the State produced no direct evidence that he pulled the trigger or even touched the gun. He also argues that his conviction was based solely on the unreliable testimony of "co-conspirators" Lambdin, White, and Freeman and that the only evidence showing he knew he was going to the victim's apartment to rob him as opposed to just buy pills from him came from the testimony of those co-conspirators. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or

reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting State v. Marable, 203 Tenn. 440, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree felony murder is defined as a "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.] Tenn. Code Ann. § 39-13-202(a)(2). In order for a killing to occur "in the perpetration of" the felony, the killing must be "done in pursuance of the unlawful act, and not collateral to it." Farmer v. State, 296 S.W.2d 879, 883 (Tenn. 1956). No culpable mental state is required for a felony murder conviction except the intent to commit the underlying felony. Tenn. Code Ann. § 39-13-202(b).

Taken in the light most favorable to the State, the evidence shows that Lambdin, White, and the appellant concocted a plan to rob the victim of pills, that they drove to the victim's apartment complex, and that Lambdin and the appellant went to the victim's apartment while White waited in the truck. However, the plan went awry, and the appellant ended up shooting the victim. Regardless of whether the appellant was the actual shooter, the jury merely had to find that the victim was killed in pursuance of the attempted robbery in order to convict the appellant of first degree felony murder. Co-defendants White and Lambdin testified about the appellant's planning and participating in the attempted robbery, and their testimony was corroborated by other witnesses and evidence at the crime scene. See State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (stating that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice"). For example, White testified that Lambdin was to return to the truck while the appellant was robbing the victim, and Lambdin testified that that he changed his mind about robbing the victim and returned to the truck while the appellant continued with the robbery. Barbara Eaton said she saw Lambdin run to the truck and saw the

appellant run to the truck one and one-half minutes later. White testified that he observed the appellant with the gun before they left Freeman's house, and Freeman said the appellant claimed he and the victim struggled over the gun. The police found the appellant's hat outside the apartment and Lambdin's gun inside the apartment. The jury, as was its prerogative, obviously accredited the testimony of the State's witnesses. In sum, the proof of the appellant's guilt in this case is more than sufficient to support the conviction.

## B. Severance

The appellant contends that the trial court erred by denying his motion to sever his trial from that of Lambdin. He argues that their cases should have been severed because both co-defendants testified against him at trial and because their testimony "was more than merely antagonistic, it caused [him] gross prejudice and resulted in [his] being unable to receive a fair trial." The appellant argues that Lambdin's testimony was particularly prejudicial in that Lambdin used his testimony to appear the more sympathetic defendant. The State argues that the trial court properly refused to grant the motion to sever. We agree with the State.

In February 2010, the grand jury jointly indicted the appellant, Lambdin, and White for killing the victim. White began cooperating with the State, and the State indicated that it planned to try jointly only the appellant and Lambdin. One week before trial, the appellant filed a motion to sever his trial from that of Lambdin on the grounds that both co-defendants were going to testify against him and that Lambdin's testimony would result in "gross prejudice." Lambdin filed a motion opposing severance, arguing that the appellant had failed to show that a severance was necessary in order for him to receive a fair trial.

At a hearing on the motion, counsel for the appellant argued that severance was necessary pursuant to Rule 14(c)(2), Tennessee Rules of Criminal Procedure, because Lambdin's testimony would prevent the appellant from receiving a fair trial and be "detrimental" to the appellant's case. The trial court denied the appellant's motion to sever. On the morning of the first day of trial, the State finally moved to sever White's case from that of the appellant and Lambdin, and the trial court granted the motion.

Tennessee Rule of Criminal Procedure 14(c)(2) provides that a trial court shall grant a severance of defendants before trial if "the court finds a severance necessary to protect a defendant's right to a speedy trial or appropriate to promote a fair determination of the guilt or innocence of one or more defendants." Whether to grant a severance lies within the sound discretion of the trial court. State v. Meeks, 867 S.W.2d 361, 369 (Tenn. Crim. App. 1993) (citing State v. Coleman, 619 S.W.2d 112, 116 (Tenn. 1981)).

This court will not find an abuse of the trial court's discretion unless the record clearly shows that the defendant was so prejudiced by the joint trial that the granting of a severance became a judicial duty. State v. Burton, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988).

We conclude that the trial court did not abuse its discretion by denying the appellant's severance motion. "[T]he mere fact that damaging proof against one defendant is presented will not, by itself, entitle another defendant to a severance." Meeks, 867 S.W.2d at 369. As the trial court noted in denying the appellant's motion, "The defendant must go further and establish that a joint trial will result in 'compelling prejudice,' against which the trial court cannot protect, so that a fair trial cannot be had." State v. Ensley, 956 S.W.2d 502, 509 (Tenn. Crim. App. 1996) (quoting United States v. Horton, 705 F.2d 1414, 1417 (5th Cir. 1983). The appellant has failed to cite any specific examples of prejudice in this case. While he contends that Lambdin's testimony was particularly prejudicial in that Lambdin used it to appear as the more sympathetic defendant, we note that the jury also convicted Lambdin of first degree felony murder. Therefore, we conclude that the appellant is not entitled to relief.

## C. Prosecutorial Misconduct

Next, the appellant contends that the State committed prosecutorial misconduct by vouching for the credibility of White and Freeman. The State argues that the appellant is not entitled to relief. We agree with the State.

It is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). "The prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial." State v. Garner Dwight Padgett, No. M2003-00542-CCA-R3-CD, 2004 WL 2359849, at *12 (Tenn. Crim. App. at Nashville, Oct. 21, 2004).

In Goltz, 111 S.W.3d at 6, this court outlined "five general areas of prosecutorial misconduct" that can occur during closing argument: (1) intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the

record that are not matters of common public knowledge. "In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In connection with this issue, we must examine the following factors:

> "(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case[;]
>
> (2) the curative measures undertaken by the court and the prosecution[;]
>
> (3) the intent of the prosecutor in making the statement[;]
>
> (4) the cumulative effect of the improper conduct and any other errors in the record[; and]
>
> (5) the relative strength or weakness of the case."

Id. (quoting Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

The appellant complains that the State committed prosecutorial misconduct when the prosecutor stated as follows during her rebuttal closing argument:

> I want to touch just very briefly on another issue that [was] raised by [the appellant's counsel], and that is--and to some degree by [Lambdin's counsel], regarding Anthony White's testimony and the fact that he had an agreement with the state, and I think the Court would not object to me telling you that the state has an ethical duty here to only proffer evidence and testimony that is credible. Okay. It's an ethical duty that I take very seriously, and the state would not have proffered Anthony White or Natalie Freeman if the state wasn't sure and secure that the evidence supported and corroborated--

At that point, counsel for the appellant objected, and the trial court overruled, stating, "I think it is appropriate argument." The prosecutor then continued as follows:

> So when you consider what Anthony White said, I want you to consider it in the context of other evidence,

because, yeah, Anthony did have problems. He was obviously using drugs. He had some mental health issues. There are, you know, a number of things that were wrong with that young man, but the fact is that everything that he told you is supported by other evidence and other proof in this case, and it strikes me as odd that both of these lawyers are telling you to disregard what Natalie Freeman and Anthony said that hurts their case, but, hey, when it helps them, you know, you're entitled to believe that.

At the conclusion of the prosecutor's argument, the jury retired from the courtroom, and defense counsel clarified his objection, stating that when the prosecutor commented on her "ethical duty," it vouched for the credibility of the State's witnesses and implicated that defense counsel had a different ethical duty "and that the testimony that we presented or otherwise elicited is somehow false." The prosecutor responded that she referred to her ethical duty because "I have been accused of suborning perjury and by cutting deals . . . . [B]ut what I said was in the context of having the jury understand and consider the evidence, the testimony of those two witnesses as it related to the other proof and the evidence that corroborated what they said[.]" The trial court stated that "I do believe if you had brought that up without being in the context of rebuttal that there would have been concern with it, but I think it was appropriate rebuttal argument, and I, again, for the record, deny your objection." The trial court stated that it was not going to give the jury a curative instruction.

While the prosecutor made her comments in response to argument by defense counsel, we agree with the appellant that her referring to her "ethical duty here to only proffer evidence and testimony that is credible" was an attempt to vouch for White's and Freeman's credibility. However, the prosecutor's improper argument was brief and tempered somewhat by her immediately stating that the evidence corroborated White's and Freeman's testimony. Moreover, the State's proof against the appellant was strong. Therefore, we conclude that he is not entitled to relief. See Tenn. R. App. P. 36(b).

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE

- 20 -